## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ADAM RHODES and
STACIE RHODES, *on behalf of themselves and all similarly situated individuals*,

                         Plaintiffs,

v.

BANK OF AMERICA, N.A.,

                         Defendant.

Civil Action No. ___3:17-cv-678___

## COMPLAINT

COME NOW Plaintiffs, Adam Rhodes and Stacie Rhodes ("Plaintiffs"), on behalf of themselves and all similarly situated individuals, by counsel, and file this Complaint against Defendant, Bank of America, N.A. ("Bank of America"). Plaintiffs allege as follows:

### PRELIMINARY STATEMENT

1.     Plaintiffs bring this suit on behalf of themselves and two classes of similarly situated individuals to challenge Bank of America's improper servicing practices.

2.     Plaintiffs' first class claim challenges Bank of America's failure to honor its agreements with borrowers to modify mortgages and prevent foreclosures for reasons such as a notary failing to write in his or her middle initial.

3.     This claim is simple—when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that promise to be kept. This is especially true when the financial institution is acting under the guidance of a federal program specifically targeted at preventing foreclosure and is insured by the United States government.

4.      In this case, Bank of America mailed permanent loan modification agreements to the Plaintiffs and the putative class members. The Plaintiffs and putative class members complied with all of Bank of America's requirements in signing and returning the agreement and making their first modified payment under the agreement's terms. Despite accepting the modified payments, Bank of America refused to honor the terms of the permanent modification and instead rejected the agreements for various bogus reasons, including because the notary did not include his or her middle initial in his or her signature—a requirement that is not found anywhere in the Virginia notary statute.

5.      After Bank of America improperly rejected the permanent loan modifications, they proceeded to take highly adverse and damaging actions towards the Plaintiffs and putative class members, including the rejection of their modified loan payments and the foreclosure of their homes.

6.      The Plaintiffs also allege that Bank of America wrongfully foreclosed on their and the putative class members' homes without satisfying the conditions precedent to foreclosure in Plaintiffs' Deed of Trust. Plaintiffs' Deed of Trust.

7.      Each of the Plaintiffs' and the putative class members' mortgage loans were insured by the Federal Housing Administration ("FHA") and required a "face-to-face meeting" with Plaintiffs and that putative class members—or at least a reasonable attempt to arrange such a meeting—as a condition precedent to Defendant's foreclosure of their home (as required by the Code of Federal Regulations).

8.      Bank of America did not attempt to conduct these face-to-face meetings or otherwise comply with the HUD and FHA requirements before foreclosing on the Plaintiffs' and putative class members' homes.

9. These wrongful foreclosures constituted a breach of the Plaintiffs' and putative class members' FHA Deeds of Trust.

10. As a result of this conduct, Plaintiffs and the putative class members were wrongfully deprived of an opportunity to cure their delinquencies, pay their mortgage loans, and save their homes. Bank of America's actions thwart FHA-HAMP's purpose and are illegal under Virginia law.

11. As the entities that perform the day-to-day management of loans on behalf of lenders and investors, "servicers can have a direct and profound impact on borrowers." *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024) [hereinafter 2013 Regulation X Amendments].

12. The financial crisis of 2007-2008 exposed pervasive consumer protection problems in the mortgage servicing industry. *See* 2013 Regulation X Amendments, *supra* at 10700. For example, the Government Accountability Office "found pervasive problems in broad segments of the mortgage servicing industry impacting delinquent borrowers, such as servicers who have misled, or failed to communicate with, borrowers, lost or mishandled borrower-provided documents supporting loan modification requests, and generally provided inadequate service to delinquent borrowers." *Id.*

13. As a part of its response to the 2007-2008 financial crisis, Congress established the Bureau of Consumer Financial Protection (the "Bureau") and granted it with broad rulemaking,

enforcement, and supervisory powers related to Federal consumer financial law.[1] 12 U.S.C. §§ 5481-5603.

14.     Accordingly, the Bureau promulgated rules implementing provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") regarding mortgage loan servicing pursuant to the Bureau's rulemaking authority over the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617.

15.     Plaintiffs also allege individual claims against Bank of America for additional violations of several laws during its servicing and foreclosure of Plaintiffs' home.

16.     Plaintiffs allege that Bank of America violated the FCRA by: failing to fully and properly investigate Plaintiffs' disputes; failing to review all relevant information provided by the consumer reporting agencies; publishing its representations within Plaintiffs' credit files without also including a notation that these accounts were disputed; and by failing to correctly report results of an accurate investigation to each credit reporting agency.

17.     The Plaintiffs allege that Bank of America also violated RESPA by reporting adverse information to the credit bureaus regarding the payments that were the subject of Plaintiffs' Qualified Written Request.

## JURISDICTION AND VENUE

18.     For Plaintiffs' breach of contract claims, Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction

---

[1] *See generally* Margaret R.T. Dewar, *Regulation X: A New Direction for the Regulation of Mortgage Servicers*, 63 Emory L. J. 175, 177-80 (2013) (providing background on the establishment of the Bureau and the consumer protection problems exposed by the 2007-2008 financial crisis).

purposes, a national bank is a citizen of the state designated as its main office on its organization

certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006). Bank of America is, on

information and belief, a citizen of North Carolina. Plaintiffs are citizens of Virginia.

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that

this matter is brought as a putative class action in which the matter in controversy exceeds the sum

or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of

plaintiffs is a citizen of a state different from any defendant.

20.     Regarding the Plaintiffs' FCRA and RESPA claims, this Court has federal question

jurisdiction pursuant to 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 168l(p).

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because unlawful

practices are alleged to have been committed in this District, Defendant regularly conducts

business in this District, and the named Plaintiffs reside in this District.

## PARTIES

22.     Plaintiffs are each a natural person residing in this District and Division and a

consumer as defined by 15 U.S.C. § 1681a(c).

23.     Bank of America is a foreign national association authorized to do business in the

Commonwealth of Virginia through its registered offices in Richmond, Virginia. At all times

relevant to this Complaint, Bank of America was a mortgage loan servicing company governed by

RESPA and a furnisher governed by the FCRA.

## FACTS

### *FHA Mortgages are Entitled to Substantial Protections*

24.     Congress created the Federal Housing Administration ("FHA") as part of the National Housing Act of 1934. The FHA insures loans made by lenders to qualifying homebuyers. The FHA is part of the Department of Housing and Urban Development ("HUD").

25.     In the case of a default, HUD insures the full value of qualified FHA mortgages making the loans risk-free for lenders. Because of this, HUD has identified servicing practices that it considers acceptable for mortgages it insures. It is HUD's intent that "no mortgagee shall commence foreclosure or acquire title to a property until [its servicing] responsibilities . . . have been followed." 24 C.F.R. § 203.500.

26.     HUD's Handbook on Administration of Insured Home Mortgages describes the Mortgagee Collection Attitude "when acquiring the servicing of a mortgage from another mortgagee, at that time it committed itself to assume the added costs and effort required to service those mortgages in accordance with HUD guidelines should they become delinquent." U.S. Dep't of Hous. & Urban Dev., Handbook 4330.1 REV-5: Administration of Insured Home Mortgages, § 7-4 (September 29, 1994), https://portal.hud.gov/hudportal/documents/huddoc?id=DOC_ 14710.pdf.

27.     All Virginia Deeds of Trust (including Plaintiffs') insured by FHA and HUD state that "Lender may, except as limited by regulations issued by the Secretary [of Housing and Urban Development], in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if . . . ."

28.     All Virginia Deeds of Trust (including Plaintiffs') further provide that "[i]n many circumstances regulations issued by the Secretary will limit [the] [l]ender's rights, in the case of

payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by the regulations of the Secretary."

29.     The regulations, among other things, require a "face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting before three full monthly installments due on the mortgage are unpaid. . . ." 24 C.F.R. § 203.604.

30.     To that end, the regulations provide that "[s]uch a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee, its servicer, or a branch office of either, or it is knows that the mortgagor is not residing in the mortgaged property." 24 C.F.R. § 203.604(d).

31.     In *Mathews v. PHH Mortgage Corp.*, the Virginia Supreme Court held that the requirements of 24 C.F.R. § 203.604 are incorporated as conditions precedent to a foreclosure sale under the standard FHA Deed of Trust. 283 Va. 723 (2012).

32.     The "purpose of the face-to-face meeting is to 'reduc[e] the incidence of foreclosure' by providing an environment in which the 'mortgagee employee can often determine the cause of the default, obtain financial information[,] establish a repayment schedule[,] and prevent foreclosure by influencing the payment habits of mortgagors." *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 517 (2014) (quoting U.S. Dep't of Hous. & Urban Dev., Handbook 4330.1 REV-5:, *supra* ¶ 38, § 7–7(C)(1)).

### *Creation of the FHA Home Affordable Modification Program*

33.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

34.     The Act's purpose is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C. §5201.

35.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

36.     As part of this program, FHA created FHA- HAMP in order to promote the interests of the Treasury and HUD so servicers, like Bank of America, could provide assistance to borrowers to modify their mortgages to make payments more affordable.

37.     Under FHA-HAMP, the federal government incentivizes participating servicers, like Bank of America, to enter into agreements with homeowners that will adjust the existing mortgage obligations to make their monthly payments more affordable.[2]

38.     A FHA- HAMP Modification consists of two stages. First, a participating servicer, like Bank of America, is required to gather information and determine if a borrower can afford to pay the mortgage and would meet the debt-to-income requirements to qualify for a Trial Period Plan ("TPP"). The TPP consists of a three-month period in which the homeowner makes mortgage payments in the same amount as the future modified payment.

---

[2] https://www.hmpadmin.com/portal/programs/fha_hamp.jsp (last visited October 5, 2017).

39.     Bank of America offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent FHA-HAMP modification for those homeowners that execute the agreement and complete the payment requirements.

40.     If the homeowner executes the TPP Agreement, and makes all three TPP monthly payments, the second stage of the FHA-HAMP process is triggered and the homeowner is offered a permanent modification.

41.     Bank of America has routinely failed to honor its end of the process and finalize permanent modifications to homeowners. Instead, after a consumer's successful completion of a TPP, Bank of America mails the homeowner a permanent loan modification. After the homeowner signs and returns the agreement and makes the first modified payment, Bank of America rejects the modification for a myriad of impermissible and implausible reasons, including a so-called "improper" notarization of the permanent load modification agreement.

42.     By failing to honor the permanent modifications, Bank of America is preventing homeowners from pursuing other avenues of resolution, including using the money they paid toward TPP payments to fund bankruptcy plans, relocation costs, short sales, or other means of curing their default.

### *RESPA Provides Additional Protections to Mortgage Loan Borrowers*

43.     "RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans." 2013 Regulation X Amendments, *supra* at 10709.

44.     "Specifically, with respect to mortgage servicing, the consumer protection purposes of RESPA include responding to borrower requests and complaints in a timely manner,

maintaining and providing accurate information, helping borrowers avoid unwarranted or unnecessary costs and fees, and facilitating review for foreclosure avoidance options." *Id.*

45.     Consistent with these purposes, RESPA imposes mandatory duties on mortgage servicers in responding to borrower inquiries. 12 U.S.C. § 2605(e).

46.     With respect to Qualified Written Requests, § 2605(e) requires the servicer to conduct an investigation and provide the borrower with a written explanation or clarification that includes: (1) the information requested by the borrower or an explanation of why the information requested is unavailable *and* (2) the name and telephone number of a servicer employee who can provide assistance to the borrower.

47.     A servicer that fails to comply with the requirements of § 2605(e) is liable to the borrower for each failure for actual damages and, in the case of a pattern or practice of noncompliance, additional damages of up to $2,000. 12 U.S.C. § 2605(f).

48.     These requirements and the corresponding civil liability were first added to RESPA in 1990 by the Cranston-Gonzalez National Affordable Housing Act as part of a broader effort to set a national housing policy so that every American family would be able to afford a decent home in a suitable environment. *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101–625, §§ 101, 102, 941, 104 Stat 4079 (1990).

49.     In responding to the 2007-2008 financial crisis, Congress further amended § 2605 by increasing penalties that servicers incur for violations of § 2605(e) and authorizing the Bureau to prescribe regulations that are appropriate to carry out RESPA's consumer protection purposes. *See* 2013 Regulation X Amendments, *supra* at 10709.

50.     Thus, the protections in RESPA, including § 2605(e), were specifically designed to ensure that borrowers have timely access to accurate information regarding their accounts, that

borrowers are able to avoid unnecessary fees and charges, and that borrowers are able to explore all available options to avoid foreclosure of their homes. *See id.*

51.     In addition, both RESPA and the FCRA provide protections to borrowers that are designed to protect the furnishing of derogatory, erroneous information by their mortgage servicers. Dodd-Frank, Pub. L. No. 111-203, 124 Stat 1376 (2010).

52.     RESPA's remedial nature provides a necessary incentive for mortgage servicers to comply with its requirements. *See* 2013 Regulation X Amendments, *supra* at 10701. Given the unique attributes of the servicing market, servicers are incentivized "to look for opportunities to impose fees on borrowers to enhance revenues." *Id.* The Bureau observed that servicers "earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements." *Id.* Thus, the imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieve the statute's consumer protection purposes.

### *Plaintiffs Obtain a FHA Mortgage Loan*

53.     Plaintiffs have owned their home in Sandston, Virginia since October 2009 and have lived there since that time.

54.     On or around October 30, 2009, Plaintiffs took out a $224,702.00 FHA mortgage loan for their home.

55.     Bank of America currently services Plaintiffs' mortgage loan and, at all times relevant to this Complaint, was also the holder of Plaintiffs' note for their mortgage loan.

***Plaintiffs Apply for a FHA-HAMP Loan Modification***

56.     Plaintiffs experienced financial hardship and fell behind on their monthly mortgage payments.

57.     In late 2016, Plaintiffs sought help from Bank of America to preserve their home and make their mortgage more affordable. They applied for a FHA-HAMP loan modification.

58.     Bank of America offered the Plaintiffs a FHA-HAMP trial period plan ("Plaintiffs' TPP"), in which Plaintiffs would make three modified payments from December 2016 through February 2017.

59.     Plaintiffs executed their TPP agreement and submitted all required documentation to Bank of America.

60.     Plaintiffs made each of the TPP payments on time and as instructed by Bank of America and they complied with all other terms of the TPP.

61.     On or around February 15, 2017, Bank of America offered Plaintiffs a permanent loan modification, with monthly mortgage payments of $1,363.57 effective March 1, 2017, by mailing them a loan modification agreement with instructions to sign the agreement, have it notarized, and return it to Bank of America for processing.

62.     Plaintiffs accepted this offer and complied with Bank of America's instructions. They signed the agreement, had it notarized, and returned it to Bank of America before the deadline.

63.     Plaintiffs also started paying their modified mortgage payments pursuant to the loan modification agreement. Bank of America accepted Plaintiffs' March and April payments.

64.     Despite Plaintiffs' compliance with all of the TPP and permanent modification requirements, Bank of America refused to honor the terms of the permanent modification

agreement. Instead, by letter dated April 14, 2017, Bank of America rejected the Plaintiffs' submission of the permanent modification agreement and stated that they were no longer eligible for FHA-HAMP modification.

65.     In addition, Bank of America started rejecting Plaintiffs' modified payments, which they continued to timely submit under the terms of the permanent modification agreement.

### Bank of America Forecloses on Plaintiffs' Home

66.     Despite the Plaintiffs' submission of their modified monthly mortgage payments, Bank of America foreclosed on Plaintiffs' home in July 2017.

67.     Prior to conducting the foreclosure of their home, Bank of America made absolutely no effort to arrange a face-to-face meeting with the Plaintiffs either before they missed three full monthly installment payments or prior to any foreclosure sale.

68.     Moreover, Bank of America never made a trip to Plaintiffs' home with the intent to provide loss mitigation services within this timeframe.

69.     Plaintiffs' property is within 200 miles of a Bank of America branch office, and therefore, Plaintiffs were entitled to a face-to-face interview.

70.     Therefore, because the condition precedent of a FHA face-to-face meeting was not attempted or accomplished, Plaintiffs' Deed of Trust did not authorize foreclosure.

71.     As a result of Bank of America's breach of the Plaintiffs' Deed of Trust, Plaintiffs suffered damages exceeding $75,000 including, but not limited to: (1) loss of equity in their property; (2) the future value and equity in the property; (3) damage to their credit; (4) future moving expenses; (5) future rent; and (6) expenses and costs attributed to the wrongful foreclosure.

72.     At the time of the foreclosure, the value of Plaintiffs' property and the balance of their loan exceeded $75,000.

*Plaintiffs Sent Bank of America a Qualified Written Request*

73.     Plaintiffs wanted to understand the basis for Bank of America rejecting their permanent modification agreement and evaluate their options moving forward.

74.     By a letter dated August 17, 2017, Plaintiffs disputed the denial of their permanent loan modification and requested information from Bank of America concerning their home loan (the "Qualified Written Request").

75.     Plaintiffs sent the Qualified Written Request to Bank of America's designated address for these types of correspondences.

76.     Plaintiffs' Qualified Written Request included their names and account number and specifically described the information that they sought, as required by 12 U.S.C. § 2605(e)(1)(B).

77.     Plaintiffs' Qualified Written Request specifically requested that Bank of America not report any late payments to the consumer reporting agencies. They explained that they had paid their mortgage in accordance with their permanent loan modification and that those payments should not be considered late.

78.     On or around September 22, 2017, Bank of America sent Plaintiffs a letter responding to their Qualified Written Request.

79.     In its letter, Bank of America stated that it had properly rejected Plaintiffs' permanent loan modification agreement because the notary's signature and printed name did not contain the notary's middle initial. However, there is nothing in the Virginia notary statute that requires a notary to print his or her middle initial in order for a seal to be valid.

*Plaintiffs Dispute Bank of America's Inaccurate Credit Reporting*

80.     On or about August 17, 2017, Plaintiffs obtained copies of their credit reports, which reflected that their Bank of America mortgage account was past due for the period of March 2017 through July 2017.

81.     This information was erroneous as Plaintiffs had been making timely modified payments in accordance with their modification agreement with Bank of America.

82.     On or around August 17, 2017, Plaintiffs sent written disputes letters to the consumer reporting agencies. In their dispute letters, Plaintiffs provided proof of their mortgage payments.

83.     Bank of America failed to conduct a reasonable investigation of Plaintiffs' disputes and the derogatory information continued to be reported on Plaintiffs' credit reports.

84.     In September 2017, Plaintiffs issued follow-up dispute letters to the credit bureaus, which indicated that Bank of America was continuing to furnish derogatory and inaccurate information that was being reported on their credit reports.

85.     Upon information and belief, Bank and America again failed to conduct a reasonable investigation of Plaintiffs' disputes and the derogatory, inaccurate information continues to be reported on Plaintiffs' credit reports to this day.

86.     Bank of America continued to furnish information regarding the disputed payments to the credit bureaus during the 60-day period following its receipt of Plaintiffs' Qualified Written Request in violation of RESPA, 12 U.S.C. § 2605(e)(3).

87.     For example, Bank of America told the consumer reporting agencies that the disputed payments should remain on the Plaintiffs' credit reports in response to the Plaintiffs' dispute letters.

88.     Bank of America also provided monthly reporting updates to the consumer reporting agencies regarding the Plaintiffs' mortgage account and continued to do so while their Qualified Written Request was pending.

89.     Upon information and belief, this inaccurate and unlawful reporting was caused by Bank of America's uniform failure to adopt any policies or procedures to comply with 12 U.S.C. § 2605(e)(3).

90.     Upon information and belief, Bank of America had no policy or procedure to cease the furnishing of adverse information regarding a borrower's payment and status of the account to the credit bureaus during the 60-day period following receipt of a qualified written request concerning the disputed payment.

91.     As a result of Bank of America's conduct, Plaintiffs have suffered actual damages, including the illegal foreclosure of their home, credit denials for potential apartment rentals, decreased credit scores, damage to their reputation, embarrassment, humiliation, and other emotional distress.

92.     At all times pertinent to this Complaint, Bank of America's processing of consumer reports was willful and carried out in reckless disregard for a consumer rights as set forth under the FCRA. By example only and without limitation, Bank of America's conduct was willful because it was intentionally accomplished through intended procedures and as Bank of America's efficiency in processing disputes is believed to be more important than making sure that the disputes are investigated thoroughly and accurately.

## COUNT ONE:
## BREACH OF CONTRACT - PERMANENT LOAN MODIFICATION
## (CLASS CLAIM)

93.     Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

94.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a Class initially defined as:

> All persons residing in the United States (1) who have a mortgage loan serviced by Bank of America; (2) who applied for a loan modification; (3) and who thereafter successfully completed a TPP; (4) to whom Bank of America mailed a permanent loan modification agreement; (5) which the consumer signed, had notarized, and timely returned to Bank of America; and (6) Bank of America thereafter refused to honor the permanent loan modification because of a so-called improper notarization within the five years preceding the filing date of this Complaint.

Plaintiffs are class members.

95.     Based on the size of the modifications at issue, Plaintiffs believe that the amount in controversy exceeds $5 million.

96.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Bank of America's internal business records, and they may be notified of the pendency of this action by published and/or mailed notice.

97.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether the Plaintiffs and the putative class members had a binding contract with Bank of America for a permanent loan modification; (2) whether the Defendant's failure to honor the permanent loan modifications amounted to a breach of contract; and (2) the appropriate remedy for Defendant's conduct.

98.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the

other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

99.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intend, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

100.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Bank of America's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

101.     As described above, the permanent loan modification agreements that Bank of America sent to the Plaintiffs and the putative class members constituted a valid offer.

102.    By executing the permanent loan modification agreements and returning them to Bank of America along with the required payment, Plaintiffs and the putative class members accepted Bank of America's offers.

103.    Alternatively, Plaintiffs' and the putative class members' return of the permanent loan modification agreements constituted an offer, which Bank of America accepted when it accepted Plaintiffs' and the putative class members' modified payments.

104.    Plaintiffs' and the putative class members' completion of a trial period plan and continued modified payments to Bank of America constitute consideration. By making those payments, Plaintiffs and the putative class members gave up the ability to pursue other means of saving their home.

105.    By failing to honor Plaintiffs' and the putative class members' permanent HAMP modifications, Bank of America breached its contracts with the Plaintiffs and the putative class members.

106.    Plaintiffs remain ready, willing, and able to perform the contract by making timely modified payments as required by the terms of the permanent loan modification.

107.    Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach. By making the TPP and permanently modified payments, Plaintiffs forewent other remedies that might have been pursued to save their home, such as restructuring their debt under the bankruptcy code or pursuing other strategies to deal with their default, such as selling their home. The also suffered an illegal foreclosure of their property by Bank of America.

108.    Because of Bank of America's breach of contract, Plaintiffs and the putative class members request that the Court award them their actual damages, reinstatement of their mortgages, rescission of any foreclosure sales, and specific performance of their permanent modifications.

**COUNT TWO:**
**BREACH OF CONTRACT- DEED OF TRUST**
**(CLASS CLAIM)**

**109.**     Plaintiffs incorporate by reference each of the allegations set forth in the preceding

paragraphs. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth

herein.

110.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action for themselves and on behalf of a class initially defined as follows.

> All natural persons (a.) located in the Commonwealth of Virginia (b.) who
> had a mortgage loan on or after October 5, 2012, which was insured by the
> Federal Housing Administration; (c.) and suffered a completed foreclosure
> when Bank of America was the beneficiary and servicer of the Deed of Trust
> (d.) for a property that Defendant's pre-foreclosure records stated a value
> greater than $75,000.

111.     **Numerosity.  Fed. R. Civ. P. 23(a)(1).** Plaintiffs do not know the exact size or

identities of the proposed class members, since such information is in the exclusive control of

Defendant. However, based on the volume of foreclosures conducted by Defendant in the past five

years, Plaintiffs reasonably estimate that the proposed class size is hundreds, if not thousands, of

Virginia consumers. Therefore, the proposed class is so numerous that joinder of all members is

impracticable.

112.     Based on the estimated size of the class, Plaintiffs believe the amount in

controversy exceeds $5 million due to loss of equity of the putative class members and other

expenses associated with the loss of their homes to foreclosures.

113.     **Existence and Predominance of Common Questions of Law and Fact. Fed. R.**

**Civ. P. 23(a)(2).** Common questions of law and fact exist as to all class members. These questions

predominate over the questions affecting only individual members. All members of the class have

been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

> a.   The review and interpretation of the FHA's form Deed of Trust;
>
> b.   The nature, scope and operation of Defendant's obligations to homeowners under the FHA;
>
> c.   Whether Defendant's failure to comply with 24 C.F.R. § 203.604 amounts to a breach of contract; and
>
> d.   Whether the Court can order Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief and whether the foreclosure sale is void.

114.   **Typicality. FED. R. CIV. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each class member for the reasons alleged in the previous paragraph and in that the other class members were subject to the same conduct as Plaintiffs, signed the same agreement, and were met with the same absence of the requirements of the face-to-face interview. In addition, Plaintiffs are entitled to relief under the same causes of action as the other class members;

115.   **Adequacy.** Plaintiffs are adequate representatives of the class because their interests coincide with, and are not antagonistic to, the interests of the class members  that they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously. FED. R. CIV. P. 23(a(4). Plaintiffs and their Counsel will fairly and adequately protect the interests of the members of the Class.

116.   **Superiority.** As alleged previously, there are significant questions of law and fact common to the class members. These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation

necessitated by Defendant's conduct. It would be virtually impossible for the individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation; it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct.  By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

117.    **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendant has acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. FED. R. CIV. P. 23(b)(2). Plaintiffs ask for a declaration that the foreclosure deed was void and an injunction against further attempts to foreclose until and unless the terms of the Deed of Trust have been met.

118.    A Deed of Trust is construed under Virginia law as a contract.

119.    As a precondition to foreclosure under the terms of the Deed of Trust, Defendant was required to make at least one trip to Plaintiffs' property prior to falling more than three installments behind and prior to foreclosure in order to provide loss mitigation services as required by the FHA.

120.    Defendant breached the Deed of Trust and did not satisfy the preconditions to foreclosure due to its failure to make at least one trip to see Plaintiffs and the putative class members.

121.     Sending a representative from a third-party contractor who has no authority to offer Plaintiffs and the putative class members a loan modification does not satisfy Defendant's preconditions to foreclosure under the terms of the Deed of Trust.

122.     Defendant's breaches of the Note and Deed of Trust have caused Plaintiffs and the putative class members to suffer economic damages for which there is no adequate remedy at law, and for which Defendant should be held liable.

123.     By means of example only, Plaintiffs and members of the putative class lost their homes, lost equity in their homes, or were forced to pay relocation expenses as a direct result of Defendant's conduct.

124.     The value of each putative class member's economic loss is greater than $75,000.

125.     Moreover, Plaintiffs on behalf of themselves and the putative class, request that the Court declare the foreclosure sales void or in the alternative voidable, impose a resulting trust, or in the alternative, a constructive trust for their benefit so that their homes can be deeded back to them.

Plaintiffs and the putative class members are also entitled to actual damages for each class member who has incurred such damages.

### COUNT THREE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)
### (INDIVIDUAL CLAIM)

126.     Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

127.     On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiffs' disputes.

128.     When Plaintiffs disputed their account with the credit bureaus, Bank of America used a dispute system named, "e-Oscar," which has been adopted by the consumer reporting agencies and their furnisher-customers such as Bank of America. E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systemic and uniform.

129.     When the credit bureaus receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

130.     Upon information and belief, the ACDV form is the method by which Bank of America has elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

131.     Upon information and belief, Plaintiffs allege that the credit bureaus forwarded Plaintiffs' dispute via an ACDV to Bank of America.

132.     Bank of America understood the nature of Plaintiffs' disputes when it received the ACDV form.

133.     Upon information and belief, when Bank of America received the ACDV form containing Plaintiffs' disputes, Bank of America followed a standard and systemically unlawful process where it only reviews its own internal computer screen for the account and repeats back the same information to the ACDV system that was previously reported to the credit reporting agency.

134.     Upon information and belief, when Bank of America receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in their computer system is itself accurate.

135.     Because of Bank of America's violations of 15 U.S.C. § 1681s-2(b)(1)(A), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other emotional distress.

136.    Bank of America's conduct in violating § 1681s-2(b)(1)(A) was willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, entitling Plaintiffs to recover under 15 U.S.C. §1681o.

137.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Bank of America in an amount to be determined pursuant to 15 U.S.C. §§ 1681n and 1681o.

**COUNT FOUR:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)**
**(INDIVIDUAL CLAIM)**

138.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

139.    On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit bureaus.

140.    As Plaintiffs detailed in the previous Count, Bank of America has elected to use the e-Oscar system for its FCRA disputes received through the consumer reporting agencies.

141.    Bank of America was aware of the meaning of the several dispute codes used by the consumer reporting agencies in e-Oscar.

142.    Bank of America does not contend that the ACDV system is an inadequate means to receive FCRA disputes through the consumer reporting agencies.

143.    Bank of America understood Plaintiffs' disputes and that Plaintiffs claimed the information was inaccurate.

144.    Because of Bank of America's violations of 15 U.S.C. § 1681s-2(b)(1)(B), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other emotional distress.

145.    Bank of America's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for punitive damages in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

146.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

### COUNT FIVE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
### (INDIVIDUAL CLAIM)

147.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

148.    On one or more occasions within the past two years, by example and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing its representations within Plaintiffs' credit files without also including a notation that these accounts were disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

149.    Specifically, Bank of America failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to the credit reporting agencies, which would have indicated that the account was disputed.

150.    Upon information and belief, Plaintiffs allege that Bank of America rarely, if ever, added the XB code or other notation that an account was disputed when it responded to ACDV forms.

151.    Furthermore, Bank of America knew that Plaintiffs disputed the subject account through their dispute letters to the credit reporting agencies.

152.    Plaintiffs' disputes were bona fide as their account was not past due because they made timely monthly payments in accordance with their permanent loan modification for the period of March 2017 through July 2017.

153.    Because of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other emotional distress.

154.    Bank of America's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, entitling Plaintiffs to recovery against Bank of America under 15 U.S.C. §1681o.

155.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Bank of America in an amount to be determined pursuant to 15 U.S.C. §§ 1681n and 1681o.

**COUNT SIX :**
**VIOLATION OF RESPA, 12 U.S.C. § 2605(e)(3)**
**(INDIVIDUAL CLAIM)**

156.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

157.     Bank of America violated RESPA, 12 U.S.C. § 2605(e)(3), by continuing to furnish information regarding the disputed payments to the credit bureaus during the 60-day period following its receipt of Plaintiffs' Qualified Written Request.

158.     Specifically, Bank of America continued to update its reporting of Plaintiffs' mortgage loan each month and verified the inaccurate payment information in response to Plaintiffs' dispute to the consumer reporting agencies.

159.     As a result of Bank of America's violations of 12 U.S.C. § 2605(e)(3), Plaintiffs suffered concrete and particularized harm including damage to their creditworthiness and credit scores for the publication of derogatory credit information that Bank of America was precluded from publishing, loss of credit, damage to reputation, embarrassment, aggravation, the cost of certified mail postage, and other emotional distress.

160.     This is a pattern and practice for Bank of America. It does not cease its consumer reporting of tradelines in the ordinary course of business when a qualified written request is pending. For example, Bank of America had the same course of conduct as to both Plaintiffs in this case. Additionally, Plaintiffs' counsel is also aware of another case where Bank of America did not cease the reporting of disputed payment information during the pendency of those consumers' qualified written request. *See O'Dell v. Bank of America, N.A.*, 7:17-cv-467 (W.D. Va.). Plaintiffs allege that Bank of America has uniform policies that it follows, and the example of these four consumers is consistent and in accordance with Bank of America's pattern and practice.

161.     Because of Bank of America's violations of RESPA, 12 U.S.C. § 2605(e)(3) Plaintiffs and the putative class members are entitled to recover "any actual damages to each of

the borrowers in the class," "any additional damages" "in an amount not greater than $2,000 for each member of the class," their attorneys' fees, and costs. 12 U.S.C. § 2605(f).

WHEREFORE, Plaintiffs request that the Court enter judgment against Bank of America on behalf of themselves and the classes they seek to represent for: (1) certification of this matter to proceed as a class action; (2) order rescission of any improper foreclosures conducted after Bank of America improperly rejected a permanent loan modification; (3) order the specific performance of the loan modifications to which the Plaintiffs and putative class members are entitled; (4) declare the foreclosure sale of Plaintiffs' home void or in the alternative, voidable, and impose a resulting trust or in the alternative, a constructive trust for their benefit so that their home can be deeded back to them; (5) award actual and additional statutory damages as pled herein; (6) attorneys' fees, litigation expenses, and costs of suit; (7) punitive damages for their individual FCRA claims; and (8) such other relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**ADAM RHODES**
**STACIE RHODES**

By:____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*